Plaintiff injured his right shoulder under compensable circumstances on December 8, 1989, and after multiple surgeries, was rated as having a 25% permanent partial impairment of the upper right extremity. As the record closed, plaintiff was 66 years old and suffered from significant non-work related complaints in addition to those in dispute, and had not returned to his career occupation in the restaurant business. Voluminous lay testimony of persons acquainted with the plaintiff and the objective medical evidence would support a conclusion that he suffers continuing disability if his claims of debilitating discomfort were believed. Instead, the Deputy Commissioner concluded that they were not, that his inability to earn wages ended "no later than the summer of 1990", that the credible evidence did not establish a diminution of his earning capacity due to the accident, and that the defendants' continuing payments of weekly benefits until the award exceeded both temporary total and permanent partial benefits due. These conclusions were based primarily on the Deputy Commissioner's belief that plaintiff had exaggerated and malingered at the time of a 1981 compensation claim, that he failed to give an honest effort during a functional capacity evaluation (revealing inconsistent behavior and symptom magnification), and that he carried on a furnishings and restaurant equipment sales business involving significant activity and income following the accident. He also considered evidence of plaintiff's negotiations with a new nightclub in May 1990. This evidence, and the inferences that reasonably may be drawn from it, also are sufficient to support a finding that disability ended. The Deputy Commissioner was in a superior position to see, hear and evaluate the credibility of the lay witnesses, notably including the plaintiff, his brother, the owner of the flea market in question, and the private investigator who made purchases from the plaintiff. From time to time the Commission has modified a result when it concluded that a Deputy Commissioner had misapprehended some significant portion of the evidence, or when facts found pointed to a different result. However, in this case, the Full Commission's normal deference to its Deputy's evaluation resolves the appeal in favor of the defendants. Pollard v. KrispyWaffle #1, 63 N.C. App. 354, 304 S.E.2d 762 (1983). Plaintiff complains that the Deputy failed to make detailed findings concerning his witnesses' testimony. "The Commission is not required to make a finding as to each detail of the evidence or as to every inference or shade of meaning to be drawn therefrom." The Commission's findings do not catalog or digest all of the evidence. The Commissions file preserves it, and the parties' briefs characterize it to their best advantage. Instead, the findings "tell the whole story" — as the finders understand and believe it — with those facts pertinent to the conclusions. Here, the hearing Deputy properly found facts concerning plaintiff's wage earning capacity and his basis for them. Guest
v. Brenner Iron Metal Co., 241 N.C. 448, 451, 85 S.E.2d 596
(1955); Starr v. Charlotte Paper Co., 8 N.C. App. 604, 608,175 S.E.2d 342 (1970).
During the litigation of this claim, controversy arose over communication with plaintiff's treating physician that plaintiff considered an egregious attempt "to poison [plaintiff's] relationship with his doctor" and to influence the physician's evaluation of plaintiff's physical capacity and ability to earn wages. Our Supreme Court has pointedly recognized the impediment such contacts can be to the proper administration of justice, and it is important that we acknowledge the problem and discuss our ability to deal with it. Crist v. Moffatt, 326 N.C. 326, 335,389 S.E.2d 41 (1990), Otherwise, our Courts might feel obligated to mandate a less tailored remedy.
Dr. Wyker was sent a videotape and investigative reports with a cover letter from defendants' counsel declaring that, "We now have conclusive evidence that in fact Mr. Vassilion is operating his own business." Depo. of Dr. Wyker, p. 26. The tape showed plaintiff at Watson's Flea market, where he contended he helped out his brother's business for a couple of hours on weekends as a hobby and diversion, and earned no income. Much of the parties' argument before the full Commission centered on the Supreme Court's holding in Crist, a malpractice claim wherein defense counsel had ex parte conversations with the plaintiff's treating physician, that "defense counsel may not interview plaintiff's non-party treating physicians privately without plaintiff's express consent," in lieu of the formal discovery procedures in the N.C. Rules of Civil Procedure (at p. 336). Under the facts presented to the Court in that case,
 the gravamen of the issue is not whether the evidence of Plaintiff's medical condition is subject to discovery, but by what methods the evidence may be discovered. We conclude that the considerations of patient privacy, the confidential relationship between doctor and patient, the adequacy of formal discovery devices, and the untenable position in which ex parte contacts place the non-party treating physician supersede defendant's interest in a less expensive and more convenient method of discovery.
Crist, at 336. Obviously, workmen's compensation litigation provides a much different context, and not just because of the statutory waiver of a claimant's privilege to medical records in G.S. § 97-27. This has more to do with the fact that the defendant has the duty to provide treatment and the right, within limits, to select providers. See § 97-25; Schofield v. Great Atl. Pac. TeaCo., 299 N.C. 582, 587-88, 264 S.E.2d 56 (1980). The malpractice claimant may also waive his or her records privacy privilege.Crist, at 331. But in application, the malpractice defendant is thereby accessing plaintiff's history, not concurrently arranging or influencing plaintiff's treatment. Compensation defendants have reason to contact the physician or his office about claimant's excuses from work, probable length of disability, financing treatment — particularly if referrals for expensive diagnostic tests, the treatment of specialists, admission to rehabilitation programs, or the assistance of a vocational expert is contemplated — limitations to be considered in planning claimant's return to work, questions about medical billings (see I. C. Rule 407(3)), and the impairment rating on which to base an offer in settlement of their liability for permanent partial disability. N.C.G.S. § 97-2(19), 97-25 and 97-31. Compensation patients do not have the same expectation of privacy noted inCrist (at 334) when defendants are arranging and paying for treatment. Only about 9% of paid indemnity claims in North Carolina spark disagreements serious enough for one party or the other to file a request for hearing, and many of these contests concern the amount or kind of benefits due in admitted cases. D. Ballentyne, Workers' Compensation in North Carolina, (Workers' Compensation Research Institute, 1993), p. 54. Thus, in the vast majority of these more serious cases, the employer has accepted responsibility for providing treatment, as it is needed, and its representatives are likely to be in contact with the physician. Additionally, there are approximately 160,000 cases annually that are, or should be, reported by employers as "medical only" cases that are rarely contested on any issue. But there is some tension, if not outright dispute, between the parties in many of these cases that never result in a request for hearing, over such matters as timely return to work, degree of limitations, the need for continued therapeutic or palliative treatment, etc. Adjusters and rehabilitation specialists have sparked more complaints of undue influence over physicians than attorneys, who frequently become involved in a case only to put together a settlement agreement, and facilitate that by acquainting the treating physician with the legal concepts (e.g., maximum medical improvement, permanent partial impairment, increased risk, significant contribution, substantial change of condition, etc., etc.) by which medical opinion must be framed to be useful. A treating physician's reaction to a video — particularly whether or not it is consistent with the doctor's expectations — is often more informative for the Commission than the tape itself. Thus the Court's solution for malpractice cases — limiting defendants' counsel's contact with plaintiff's physician to formal discovery — is not practically available to us. No "bright line rule" can define either the cases or individuals precisely enough to be a reasonable or effective ban on overreaching during such contacts.
Nor are the same considerations the Court found outweighed any benefits of informal, direct contact with the physician inCrist present in the compensation system. "[P]atient privacy, [and] the confidential relationship between doctor and patient" are waived as part of the quid pro quo for the employer's payment for treatment. "Formal discovery devices" are clearly inadequate for the flow of timely opinions, recommendations and authorizations necessary to see to the patient's immediate care on an as needed basis. And, as a group, physicians who treat traumatic injuries are probably more aware and wary of the motivations of participants in the comp system than their colleagues.
That is not to say that ex parte influence is not a serious problem. Because of the pivotal role the physician plays in determining benefits, disinformation and prejudicial influence can be as damaging in the comp case as the malpractice case. The Commission has frequently noted misuse of direct contact with the treating physician by a party — most frequently by malingering patients. We admonish counsel not to present evidence to the physician without simultaneous disclosure to opposing counsel, not to vouch for it personally — for the same reason this is prohibited before a tribunal (see Canon VII, Rule 7.6(C)(4) and I. C. Rule 701(6)) — and as a matter of good faith and professional courtesy, counsel should share with the physician the source and circumstances of any evidence or information furnished which would logically figure into its evaluation (e.g., in the case of videotape of a patient's physical activity, the period of surveillance from which the action depicted in the tape was extracted).
In egregious cases, where the independent medical opinion of the physician is lost due to overreaching, the Commission might remedy the situation by taking additional evidence, retaking a physician's testimony after any clear misimpressions are dispelled, or retrying the claim at the offending party's expense. In all instances, we must begin by considering whether the attempt to influence the physician succeeded, and whether that has influenced the outcome of the case, bearing in mind that, as here, the Deputy Commissioner was also aware of what the physician had seen when evaluating his testimony. In this case, we note that Dr. Wyker testified that his opinions did not rely on the videotape and investigative report or the characterizations in the accompanying letter; the Deputy Commissioner found that the information provided in these was, essentially, factual and correct; that Dr. Wyker's own examination and treatment over an extended period, the records of his medical colleagues, and the functional capacity evaluation provided an independent basis for his opinions; and, that plaintiff argued those opinions supported his position. Consequently, the plaintiff was not actually prejudiced by the incident.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS from the Opinion and Award of the Deputy Commissioner the following FINDINGS OF FACT:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The Form 21 Agreement for plaintiff's March 9, 1989 injury by accident, having been approved by the Commission, constitutes an Award of record and the same is incorporated herein by reference.
2. The parties stipulated at the May 28, 1991 hearing that plaintiff continued to receive workers' compensation benefits.
3. The parties have stipulated into evidence two pages of Dr. Rendleman's office notes, a four page report of Dr. Freedman, and forty-three pages
* * * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. Plaintiff, who was born in the Sudan, Africa on November 25, 1925 and is of African-Greek origin, graduated from high school and a four-year college in the Sudan. He thereafter obtained a Certificate in Maitre d'Hotel at Bennett College in London. He speaks fluent Arabic, English, Greek and Italian and he writes well in all of those but Italian.
2. His work experience since December 1957 has been primarily in kitchen, restaurant, and lounge management for hotel and motel chains, a country club, and for various establishments which he owned or which were owned by his brother, Johnny Vassilion.
3. Plaintiff's medical history prior to his beginning work for defendant-employer in April 1988 includes the following: left mastoid operation in 1958 and deafness in the left ear and some loss of hearing in the right ear; brain tumor removal in 1970 without residual effect; inguinal hernia repair and appendectomy in 1977; history of knee injury and history of heart disease in 1979 when he experienced a myocardial infarction; plastic surgery on the right ear in 1980; surgical repair of his nose in 1986; a history of lumbar strain and left knee strain in 1981; and a history of back injury in 1985. Despite these medical conditions, he was able to work on essentially a regular basis from 1958 to April 1988.
4. In April 1988 he began working as a cook for defendant-employer on a part-time basis and beginning in September 1988 he was employed full-time as the club manager. In that latter position, his duties included taking care of weddings, banquets, and graduations, and, on occasions, helping unfold and set-up heavy tables and carrying heavy items weighing up to sixty-five pounds.
5. When plaintiff applied for employment with defendant-employer he submitted a two-page personal data sheet which was a resume of his education and work experience wherein he related, among other things, that from 1982-1984 he was the owner of The Grecian Gardens Restaurant. Plaintiff testified at a workers' compensation hearing on May 25, 1983 (concerning a claim for disability due to a January 6, 1981 injury by accident) that his brother Johnny Vassilion owned The Grecian Gardens Restaurant, that he helped his brother in the business, and that he (plaintiff) did not own or operate or have any interest in the business. Plaintiff's evidence which, if believed, would establish that he was not the owner of the business from 1982-1984 is not accepted as credible.
6. Plaintiff sustained the admittedly compensable injury by accident giving rise hereto on March 9, 1989 when he slipped on a ramp while shoveling ice and snow and fell onto the ramp, landing on the back of his head and right shoulder.
7. Following the injury by accident, plaintiff continued performing the physical job duties as a club manager until being terminated effective November 8, 1989 because of his repeated failure to perform the requirements of his job related to record keeping, payment of club related bills, ordering of supplies and storage of personal equipment. He was paid severance pay equal to thirty days of his annual salary.
8. Plaintiff was seen in the emergency room on March 9, 1989 and was referred to the Raleigh Orthopaedic Clinic for further evaluation of his complaints of right shoulder pain. A knot which appeared on his head following the accident disappeared within several weeks but he continued to experience right shoulder pain. On March 17, 1989 he came under the care of Dr. Montgomery of that clinic with complaints of right shoulder pain. X-rays established a non-displaced fracture of the greater tuberosity of the humeral head for which rest, a sling, and work on a limited basis were prescribed. Thereafter, plaintiff's continued complaints of right shoulder pain were treated with medications and an injection without improvement. A shoulder arthrogram in May 1989 established a tear of the rotator cuff tendon for which Dr. Montgomery recommended surgery, but which plaintiff declined at that time. Because of continuing difficulty with his right shoulder, plaintiff underwent acromioplasty and surgical repair of the right rotator cuff by Dr. Montgomery on December 26, 1989.
9. Plaintiff post-operatively continued to see Dr. Montgomery and on May 7, 1990 he reported to him that because he was having aching in his left shoulder, he had been seen by his internist and that cardiac abnormality was ruled out, and that the left shoulder was now improved. On examination on May 7, 1990, plaintiff had full range of motion of the left shoulder without any pain or tenderness. On examination on June 15, 1990, plaintiff had continued pain in both shoulders and his low back. When last seen by Dr. Montgomery on June 18, 1990 plaintiff complained of stiffness in the right shoulder and some pain in the left shoulder. X-rays of the left shoulder at that time revealed narrowing of the AC joint. Because of plaintiff's right shoulder pain which persisted despite medications and physical therapy, Dr. Montgomery referred him to Dr. Wyker, an orthopaedist having special expertise and interest in shoulder problems.
10. Pursuant to a Form 21 agreement which is dated February 13, 1990 and which was approved by the Industrial Commission on March 16, 1990, thereby becoming an award of the Commission, defendants undertook to pay workers' compensation benefits to plaintiff at the rate of $319.03 per week (computed on an average weekly wage of $478.52) commencing on December 8, 1989 by reason of the injury by accident of March 9, 1989, which was set forth in said agreement and award as having resulted in a torn right rotator cuff.
11. Plaintiff came under Dr. Wyker's care on July 23, 1990, and following an unsuccessful treatment regimen of medications and physical therapy, plaintiff underwent an arthrogram in July 1990 which revealed a partial rotator cuff muscle tear of the right shoulder. On August 27, 1990 Dr. Wyker conducted arthroscopic examination of that shoulder during which he performed a subacromial decompression and resection of the distal clavicle as well as repair of the rotator cuff tear.
12. Plaintiff was post-operatively placed on a regimen of physical therapy, and he experienced improvement in the range of motion of his right shoulder, but he continued to have complaints of pain in that shoulder and weakness of the shoulder muscles. He also expressed multiple complaints about other areas of his body, including a complaint of low back pain made on November 21, 1990. On examination March 4, 1991 plaintiff had weakness of the rotator cuff muscles with discomfort at the extremes of motion which was his main limiting factor. Dr. Wyker discharged plaintiff from his care at that time with a twenty-five percent impairment rating of his right upper extremity. During a meeting with plaintiff's attorney on March 25, 1991, Dr. Wyker recommended a functional capacity evaluation of not only plaintiff's right upper extremity, but also his overall limitations.
13. Defendant sent an investigative report to Dr. Wyker on December 10, 1990 which stated ". . . we have conclusive evidence that, in fact, he is operating his own business . . ." and that the defendants have continued to pay the plaintiff because, he had represented that he is not gainfully employed. The defendants also sent a videotape in support of the investigative report to Dr. Wyker on December 12, 1990. Dr. Wyker noted on January 2, 1991, that he had reviewed the videotape, and it did not reveal any problems with the plaintiff's back or feet. Dr. Wyker opined that the plaintiff could return to light work, and possibly to his regular job. Both of these contacts were ex parte.
14. Pursuant to Dr. Wyker's recommendation, plaintiff underwent a functional capacity evaluation on or about April 3, 1991. Throughout that evaluation, plaintiff demonstrated less than maximum effort, and because he engaged in a high degree of symptom magnification, his objective findings were inconsistent with anatomical and physiological findings with respect to ten different test areas. During that evaluation, plaintiff reported that he is "retired", "does not plan to return to work," and has "obtained a lawyer to help him obtain a settlement."
15. Because of plaintiff's failure to put forth maximum effort, and because of the inconsistency in his behavior and his high degree of symptom magnification, which constitutes obstructionist behavior during the functional capacity evaluation, that evaluation is an invalid assessment of his physical work capabilities and limitations. In addition, the symptom magnification manifested by him during that evaluation was consistent with Dr. Wyker's examination of him inasmuch as his subjective complaints were disproportionate to objective findings on examination. In this regard, the symptom magnification which he displayed on that evaluation is also consistent with his malingering behavior which he engaged in on February 9, 1981 with respect to his workers' compensation claim for a back and knee injury. On that occasion in February 1981, Dr. Rendleman, plaintiff's treating physician for lumbar strain and left knee strain, observed plaintiff, unbeknownst to him, moving about without any difficulty while accompanying a friend with an unrelated problem in the emergency room of the hospital. However, when Dr. Rendleman got plaintiff's attention, plaintiff came to him with an exaggerated limp and related that he was still having a great deal of trouble with his back. Again unbeknownst to plaintiff, Dr. Rendleman instructed a nurse to watch plaintiff whereupon Dr. Rendleman left the emergency room in full view of plaintiff. Plaintiff's exaggerated limp, which had been previously witnessed, then completely disappeared when Dr. Rendleman left the hospital.
16. In April 1990, a member of defendant-employer's club advised Pam Carter, defendant-carrier's adjuster, that plaintiff was active in the flea market at Watson's Flea Market. When Carter confronted plaintiff with this information in the summer of 1990, he advised her that it was a very small business and he wasn't getting a lot of money from it.
17. In October 1990, George Jost, who unbeknownst to plaintiff was a private investigator retained by defendants, went to warehouse #2 at Watson's Flea Market on Rock Quarry Road in Raleigh where he saw plaintiff at a booth. After Jost was asked by plaintiff to assist him with operating a recently purchased car jack, plaintiff asked him if he needed any good furniture. During the ensuing conversation, plaintiff stated that he was the owner of the flea market business, and that usually his helpers were there, but that he was alone on this occasion. Plaintiff further related that anything that Jost wanted he could get for him, and that Jost could call him at home if he needed to and plaintiff gave him a business care with the following information on it:
 Warehouse at (919) 832-6232 Watson's Flea Market (919) 846-1024
 EL GRECO CO. Restaurant Equipment — New Old
 Jimmy B. Vassilion 1436 Rock Quarry Road Owner Raleigh, NC 27610
The 846-1024 telephone number was the one for plaintiff's residence where he took calls about restaurant equipment, and his flea market business. There were several other sellers in the area of the warehouse, but plaintiff had the largest sales area, as well as an office behind the sales area. Plaintiff had for sale, among other things, couches and chairs, and TVs in the sales area. When Jost asked him if he had any kitchen equipment, plaintiff took him to a warehouse door located immediately outside warehouse #2 where plaintiff showed him a warehouse packed full of restaurant and kitchen equipment. Plaintiff further advised Jost that he would be sixty-five the next month and would be receiving social security payments, that he could not make over a specified amount until he was seventy, that if Jost wanted some furniture he would be at the flea market every Saturday and Sunday (those being the only two days that Watson's Flea Market vendors were open) or Jost could call him at home. On another occasion in October 1990, Jost purchased two lamps from plaintiff at his flea market business for which plaintiff gave him a receipt.
18. On another occasion in October 1990, William Fuller, another private investigator retained by defendants, saw plaintiff at his flea market business at which time plaintiff gave him a sales talk about buying a couch, and gave him the same type business card which he had previously given Jost. On yet another occasion in October 1990, plaintiff was observed by a private investigator backing his pick-up truck to a loading dock at the North Carolina State Surplus Property Agency, a governmental auction business, and having it loaded with merchandise by a worker.
19. For at least the period from October 8, 1990 until January 24, 1991, a weekly ad ran in the Ad Pak advertising "used restaurant equipment, electronics, etc., used sofas" and advising readers to "Call Jimmy 832-6232; 846-1024." The ad in the Ad Pak for the week ending January 24, 1991 contained the same language as previous ads with the exception that a line was added at the end reflecting "Owner Grecian Corner." Allegedly, the Grecian Corner was owned by plaintiff's brother, Johnny. The credible evidence fails to establish when, if ever, plaintiff sold his interest in his flea market.
20. Plaintiff, who has had storage space at Watson's Flea Market for about five years and a sales area there for an undetermined period of time, is an avid flea market shopper, especially for used restaurant equipment, who drives his truck to various flea markets where he buys items and then delivers them to his flea market business for sale. Some of the fleamarkets which plaintiff has visited include those located in Fuquay-Varina, at the State Fair Grounds, and on Capital Boulevard. As recently as June 1991, plaintiff continued to frequent surplus sales and bid on merchandise.
21. Due to the injury by accident giving rise to this claim, which resulted in injuries to plaintiff's right shoulder, he was rendered temporarily unable to earn any wages in any employment from December 8, 1989 to no later than the summer of 1990. Evidence to the contrary is not accepted as credible. While said injury by accident and the residual impairment to his right upper extremity has, since December 8, 1989, precluded plaintiff from returning to work as club manager for defendant-employer, by at least the summer of 1990 and continuing for some undetermined period of time thereafter, plaintiff has owned and operated a flea market business and a business of buying and selling new and used restaurant equipment. The duration of plaintiff's ownership of and operation of those businesses, as well as the amount of the earnings he derived therefrom are indeterminable from the evidence of record because of the lack of credibility of plaintiff's evidence, including his denial of ownership and income. The preponderance of the credible evidence fails to establish that plaintiff is entitled to additional temporary total or temporary partial disability benefits.
22. By March 4, 1991, plaintiff obtained the end of the healing period from the injury by accident giving rise hereto and the treatment rendered therefrom, and as a result of said accident, he retains twenty-five percent permanent partial impairment of the right arm. The credible evidence fails to establish that any of plaintiff's other multiple complaints, including without limitation those of low back and neck pain, knee pain, and depression, are causally related to said injury by accident.
* * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. Plaintiff is entitled to 60 weeks of permanent partial disability compensation, subject to credit for defendants' payment of temporary total disability benefits since December 8, 1989, at the rate of $319.03 per week and medical compensation, in respect to the twenty-five percent disability of his right arm resulting from the injury by accident on March 9, 1989. N.C.G.S. § 97-31(13).
2. Plaintiff has failed to prove by a preponderance of the evidence that he is entitled to additional unpaid benefits. N.C.G.S. § 97-2(9).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay plaintiff 60 weeks of permanent partial disability compensation, at the rate of $319.03 per week but said sum is fully offset by credit due the defendants for overpayment of temporary total disability compensation since December 8, 1989.
2. Plaintiff's counsel may receive a fee from the plaintiff in accordance with their contract for his services. N.C.G.S. § 97-90(c).
3. Defendants shall pay bills for medical compensation reasonably necessary to effect a cure, give relief or shorten the period of disability resulting from the injury to plaintiff's shoulder on March 9, 1989, when the same have been submitted to, and approved by, the Commission.
4. Defendants shall pay an expert witness fee in the amount of $900.00 to Dr. Ann Neulicht. Plaintiff shall remain liable to Sol Richmond in the amount of $400.00, which was assessed in the March 26, 1992 Order filed by the hearing Deputy.
5. Each party shall bear its own costs.
 S/ _____________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _____________________ FORREST H. SHUFORD, II DEPUTY COMMISSIONER
S/ _____________________ COY M. VANCE DEPUTY COMMISSIONER
JRW/tmd 8/24/94; 1/26/95